1  Nabil Abu-Assal, SBN 136764
   Email: nabil@cypressllp.com
2  Laura Premi, SBN 211492
   Email: laurap@cypressllp.com
3  Camille Rustia, SBN 277967
   Email: camille@cypressllp.com
4  CYPRESS, LLP
   11111 Santa Monica Blvd., Suite 500
5  Los Angeles, California 90025
   Telephone: (424) 901-0123
6  Facsimile:  (424) 750-5100

7  Attorneys for Petitioner Barry Sonnenfeld

COPY

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
12 APR 24 PM 4:03
BY:_____
FILED

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Arbitration between<br><br>BARRY SONNENFELD, an individual,<br><br>Petitioner,<br><br>v.<br><br>UNITED TALENT AGENCY, INC., a California corporation,<br><br>Respondent. | Case No. CV12-03560 CBM(SH)<br><br>PETITION BY BARRY SONNENFELD TO VACATE OR MODIFY AWARD OF ARBITRATOR (9 U.S.C. §§ 10, 11) |

1  This is an action by Petitioner Barry Sonnenfeld ("Sonnenfeld") for relief
2  from an arbitration award entered in egregious violation of the collective
3  bargaining agreement that governed Sonnenfeld's arbitration and long-dead
4  relationship with respondent United Talent Agency, Inc. ("UTA"). Sonnenfeld is
5  an accomplished motion picture and television director. UTA was Sonnenfeld's
6  agent in the distant past, pursuant to a strictly oral agency relationship that ended
7  more than seventeen years ago. The collective bargaining agreement that
8  governed the relationship expressly protects Sonnenfeld from any UTA claims for
9  post-termination commissions on agreements not entered into prior to the
10 termination of the agency. Nonetheless, UTA boldly claimed entitlement to a
11 commission on a director services agreement between Columbia Pictures
12 Industries, Inc. ("Columbia") and Sonnenfeld regarding the soon-to-be-released
13 "Men In Black III" ("MIB III"), even though the agreement was not entered into
14 until approximately fifteen years after the termination of the Sonnenfeld-UTA
15 relationship.

16  In direct contravention of the express terms of the governing collective
17 bargaining agreement and federal labor law, the arbitrator entered an award
18 directing Sonnenfeld to pay UTA a commission on MIB III – giving UTA a
19 *fifteen-year tail* on the agency relationship, even though the governing collective
20 bargaining agreement *expressly provides for no tail at all*. In particular, the
21 arbitrator awarded a commission without adhering to the requisite legal and
22 collective bargaining agreement standard for determining whether an agent may
23 receive a commission, namely that that the employment agreement was entered
24 into prior to the termination of the agency *and* UTA directly procured the
25 employment in question. Had the arbitrator followed the law and agreement, he
26 could not have awarded UTA any commission because there is no question that
27 Sonnenfeld's MIB III contract was entered into 15 years after the termination of
28

SONNENFELD'S PETITION TO VACATE ARBITRATOR'S AWARD
1

1  UTA's agency and UTA had no involvement in procuring the employment at all.
2  The arbitrator's failure to follow the law has led to an absurd result.
3      The award is all the more stunning, because to arrive at it, the arbitrator not
4  only had to give UTA an expressly prohibited tail, but also completely ignored
5  uncontradicted statements from Columbia admitting that UTA's factual argument
6  for a tail based on a 1995 negotiation clause in a different agreement had no merit.
7  Sonnenfeld had a first negotiation clause in his prior contract on "Men In Black
8  II" ("MIB II") that set a very high floor on contractual terms for Sonnenfeld on
9  MIB III, and which Columbia was required to offer Sonnenfeld before Columbia
10 went to any other potential directors. Columbia admitted that it did not meet these
11 terms. Columbia approached other directors about MIB III before approaching
12 Sonnenfeld, and refused to offer Sonnenfeld the contractually required ten percent
13 of first dollar gross on MIB III and final cut, among other highly material terms.
14     Whatever relief Sonnenfeld may be entitled to as to Columbia – which this
15 Court is not asked to resolve – UTA is clearly not entitled to any commission from
16 Sonnenfeld and the illegal arbitration award must be vacated. Indeed, if not
17 vacated, the illegal award will stand as a fundamental modification of the
18 collective bargaining agreement that governs relations between members of the
19 Directors Guild of America ("DGA") and talent agencies.
20     In addition, the arbitrator's award must be vacated because he failed to
21 comply with the bargained for procedures set forth in the collective bargaining
22 agreement in multiple respects. The arbitrator allowed discovery that was clearly
23 not contemplated by the agreement, thereby increasing costs for the parties and
24 delaying the arbitration hearing. Further, he failed to comply with the strict
25 timeline requirements that mandated that the hearing occur within 15 days of the
26 arbitrator's appointment unless the parties agreed otherwise. The hearing did not
27 occur for almost a year, despite Sonnenfeld's objection to the delay.
28

SONNENFELD'S PETITION TO VACATE ARBITRATOR'S AWARD
2

## JURISDICTION AND VENUE

1. The parties to this dispute are bound by the terms of the Agency Agreement between the DGA and the Association of Talent Agencies ("ATA") ("DGA-ATA Agency Agreement"), a collective bargaining agreement subject to the federal Labor Management Relations Act (29 U.S.C. § 141, *et seq.*). The Court has original subject matter jurisdiction of this matter pursuant to the provisions of 28 U.S.C. Section 1331, federal question jurisdiction. This petition seeks to vacate and/or modify the arbitration decision of Arbitrator Howard Weitzman ("Weitzman"), including on the grounds that the decision fails to draw its essence from the DGA-ATA Agency Agreement – a collective bargaining agreement. Federal question jurisdiction thus exists because the parties' dispute involves a collective bargaining agreement governed by the Labor Management Relations Act ("LMRA"), 29 U.S.C. Section 185(a). In addition, Petitioner is informed and believes, and on that basis alleges that, the DGA is a labor organization representing employees in an industry affecting commerce within the terms of 29 U.S.C. Section 185. Petitioner is informed and believes, and on that basis alleges that, Respondent UTA further falls under the terms of 29 U.S.C. Section 185, and this matter raises federal questions pursuant to 29 U.S.C. Section 185(a), (b) and/or (c).

2. The Court also has original subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1), diversity jurisdiction. The subject matter of this dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Petitioner Sonnenfeld is domiciled in East Hampton, New York. Respondent UTA is a California corporation with its principal place of business in Los Angeles County, California. The arbitration award is for a principal amount of $325,000.

3. This court has personal jurisdiction over respondent in that respondent resides in the State of California and in this District, regularly does

business within this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of California and this District.

4. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. Section 1391(b) and (c) and 9 U.S.C. Section 9, because some or all of the conduct at issue herein occurred in this district, because respondent resides in this District, has its principal place of business in this District, and the arbitration hearings at issue were conducted in January and February 2012 in Santa Monica, California, a location within the Central District of California.

## THE PARTIES

5. Petitioner Barry Sonnenfeld, an individual, is a resident of East Hampton, New York. Sonnenfeld is a director and member of the DGA. The DGA is an incorporated labor organization within the meaning of Section 301(a) of the Labor Management Relations Act ("LMRA").

6. Respondent UTA is a California corporation with its principal place of business in Los Angeles County, California. Respondent is a talent agency and a signatory to the DGA-ATA Agency Agreement.

## THE GOVERNING COLLECTIVE BARGAINING AGREEMENT

7. UTA, through agent Jim Berkus ("Berkus"), was Sonnenfeld's talent agent in the 1990s, a relationship which Sonnenfeld terminated in or about April 1995. The relationship between UTA and Sonnenfeld was never memorialized in any written agreement. It thus was governed by the statutes, regulations and other rules and laws that govern relationships between talent and California talent agencies where there is no signed agency agreement, and specifically by the rules of the DGA-ATA Agency Agreement.

8. Petitioner Sonnenfeld, by virtue of his membership in the DGA, is ostensibly bound by the DGA-ATA Agency Agreement. UTA is a member of the ATA, and bound to the DGA-ATA Agency Agreement.

1   9. The DGA-ATA Agency Agreement has been in place since at least as
2  early as 1977. Among other terms, the DGA-ATA Agency Agreement provides
3  for "form" or "baseline" terms for agency relationships between DGA members
4  and ATA members, including regarding commissions. These "form" agency
5  terms are included in a portion of the DGA-ATA Agency Agreement often
6  referenced as "Rider D." Rider D is expressly structured to require signature by
7  the DGA member for its terms to be binding *against* the specific DGA member.
8  At the same time, Title 8 California Code of Regulations ("CCR") Section 12002
9  (1989) has long provided that where a California talent agency fails to obtain a
10 signed written agreement from represented talent, enforceability of the oral agency
11 relationship for purpose of commissions is governed by a higher standard.
12 Specifically, 8 CCR Section 12002 requires the agent to prove that any claimed
13 commissionable employment agreement was *directly procured by* the agent, with
14 written confirmation 72 hours thereafter. Rider D restricts agents from claiming
15 any commission for employment terms obtained after the termination of the
16 agency. Thus, where there is no signed agency agreement, under the express
17 terms of Rider D since 1977 and 8 CCR Section 12002, ATA members are
18 prohibited from seeking post-termination commissions – "tails" – from DGA
19 members, unless the ATA member can prove that the allegedly commissionable
20 employment was entered into prior to the termination of the agency.

21  10. In 1993, the DGA-ATA Agency Agreement was further modified to
22 make this rule even clearer. In 1993, in an arbitration entitled *William Friedkin v.*
23 *United Talent Agency, Inc.*, Friedkin had terminated an oral agency agreement
24 with UTA. Despite the clear rules explained above, UTA boldly sought post-
25 termination commissions – tails – on seven employment agreements that UTA
26 worked on during the term of its agency, even though only three of the agreements
27 were actually closed or substantially negotiated during the agency term. UTA
28 argued that even though Friedkin had never signed any Rider D or any other

1 agency agreement, the unsigned form Rider D nonetheless preempted 8 CCR
2 Section 12002 such that UTA was not required to prove that each and every
3 employment agreement was closed during the term of the agency, and thus, UTA
4 claimed, it was entitled to a commission on all seven.

5     11. Unsurprisingly, arbitrator Dixon Q. Dern thoroughly rejected UTA's
6 claims in this regard. In a detailed 1993 arbitration award, Dern clearly and
7 expressly held that Rider D does *not* preempt 8 CCR Section 12002. The 1993
8 Dern award against UTA clearly states that where an ATA member does not have
9 an agency agreement signed by the actual DGA member, the DGA is member
10 entitled to the protections of **both** Rider D **and** 8 CCR Section 12002.

11     12. Thus, where the ATA member does not have an agency agreement
12 signed by the DGA member, to be entitled to a commission, the ATA member
13 must prove that the ATA member directly procured the employment in question
14 *and* that the employment agreement was entered into prior to the termination of
15 the agency – *i.e.*, the ATA member is not entitled to *any* "tail" on commissions.
16 Applying these rules, Dern rejected UTA's commission claims against Friedkin
17 with respect to every single one of the four employment agreements that UTA
18 could not prove closed prior to UTA's termination as Friedkin's agent. The 1993
19 Dern award is incorporated into and a part of the DGA-ATA Agency Agreement,
20 and it and its "no tail" rule where there is no signed agency agreement, is an
21 express term of the DGA-ATA Agency Agreement collective bargaining
22 agreement.

23 **MIB III WAS NOT AN EMPLOYMENT AGREEMENT ENTERED INTO**
24 **DURING THE TERM OF UTA'S AGENCY AND UTA DID NOT**
25 **DIRECTLY PROCURE IT**

26     13. In 1995, Sonnenfeld terminated his oral agency relationship with
27 UTA while negotiations between Sonnenfeld and Columbia for Sonnenfeld's
28 directing services on the original "Men In Black" ("MIB") motion picture were

still ongoing, but after Sonnenfeld and Columbia had substantially negotiated the financial terms for MIB. Whether he was obligated to pay a commission or not, after he went on to direct MIB, Sonnenfeld paid UTA a post-termination commission on MIB.

14. UTA never did any further work of any kind for Sonnenfeld, on any project after the 1995 termination. Instead, Sonnenfeld continued to be represented by his long-time transactional attorney, Melanie Cook, and, for several years, by Creative Artists Agency ("CAA").

15. In 2000, Sonnenfeld and Columbia entered into another, separate written agreement for Sonnenfeld's director services on "Men In Black II" ("MIB II"). In the 2000 MIB II Agreement, CAA and Attorney Cook were able to negotiate a nearly seven-fold increase in Sonnenfeld's compensation relative to the original MIB. Among other terms, the 2000 MIB II Agreement gave Sonnenfeld a 10% first dollar gross participation in MIB II, final cut rights, and a first negotiation clause that required Columbia to offer Sonnenfeld the first opportunity to direct any "Men In Black III," with all material terms – including the first dollar gross terms and final cut – to be no less favorable than MIB II. Thus, through the negotiation efforts of CAA and Attorney Cook on Sonnenfeld's behalf, if Columbia chose to produce an MIB III, it was required to offer the director position to Sonnenfeld for floor compensation of no less than a minimum $20 million, final cut rights, and various other material terms. UTA never negotiated *any* floor for Sonnenfeld for *any* sequel, prior to the termination of its agency.

16. MIB II was released in 2002. Sonnenfeld paid no further post-termination commissions to UTA, and instead expressly directed Columbia to pay all agency commissions on MIB II to CAA.

17. For reasons of its own, Columbia equivocated about producing an MIB III until 2009. Then, in 2009, Columbia decided to produce an MIB III

1 motion picture – but without honoring Sonnenfeld's MIB II first negotiation
2 clause. Sonnenfeld is informed and believes, and on that basis alleges that, in
3 2009, rather than first negotiate with Sonnenfeld, Columbia pursued discussions
4 with multiple other directors about potentially directing MIB III.

5      18. Ironically, Columbia's investigations of the market confirmed that
6 Sonnenfeld was the best choice to direct MIB III. Nonetheless, Columbia
7 communicated to Attorney Cook that Columbia had no intention of honoring the
8 MIB II first negotiation clause, and expected Sonnenfeld to direct MIB II for less
9 than a third of the $20 million minimum financial compensation to which
10 Sonnenfeld was entitled, and also to give up final cut, and many other material
11 terms to which Columbia had already bound itself as negotiating floors in the MIB
12 II agreement.

13      19. In short, Columbia expressly admitted that it was not going to honor
14 any first negotiation clause in any agreement with Sonnenfeld, and in particular
15 Columbia absolutely refused to honor any negotiating floor, despite the clear
16 material terms floor set in the MIB II agreement. Instead, Columbia required
17 Sonnenfeld to conduct an entirely new negotiation for MIB III. Columbia
18 proceeded to do exactly that. Despite Columbia's behavior, Sonnenfeld
19 proceeded to agree to direct, and did direct, MIB III for less than half of the
20 compensation to which he was entitled, although he reserves and has never
21 waived his rights to revisit the minimum compensation issue with Columbia.

## UTA SHAMELESSLY SEEKS A COMMISSION EXPRESSLY BARRED BY THE COLLECTIVE BARGAINING AGREEMENT AND WEITZMAN VIOLATES THE ARBITRATION'S PROCEDURAL RULES AND THE COLLECTIVE BARGAINING AGREEMENT'S SUBSTANTIVE RULES TO ENTER AN AWARD FOR UTA

27      20. In December 2010, UTA commenced arbitration proceedings against
28 Sonnenfeld pursuant to the DGA-ATA Agency Agreement, by filing an arbitration

demand with the DGA. In its arbitration demand, UTA named Weitzman as one of the three arbitrators. Sonnenfeld is informed and believes, and on that basis alleges that, discovery from UTA or its counsel will show that UTA had contacted Weitzman prior to naming him and had determined that Weitzman was sympathetic to UTA and intended to rule for UTA. Weitzman never made any such disclosure to Sonnenfeld.

21. Sonnenfeld duly responded and answered the arbitration demand, raising numerous affirmative defenses, expressly including the unenforceability of UTA's claim for a 15-year post-termination commission or tail, and without any signed agency agreement of any kind. At the invitation of UTA to agree to save costs by using Weitzman as the sole arbitrator rather than the three-arbitrator panel contemplated by the DGA-ATA Agency Agreement rules, and having received no conflict disclosures from Weitzman, Sonnenfeld agreed to use Weitzman as the sole arbitrator.

22. In January 2011, Sonnenfeld's representatives received a letter from the DGA confirming that both parties agreed to Weitzman as the sole arbitrator in lieu of a three-arbitrator panel. The DGA-ATA arbitration rules expressly provide that the arbitration hearing must occur within 15 days of the fixing of the arbitrator or arbitrators, Sonnenfeld never agreed to waive this rule, and indeed repeatedly referenced it. Indeed, the DGA's January 2011 letter to both parties expressly set forth the relatively short timeline to schedule the hearing.

23. Sonnenfeld requested that the hearing take place within the timeframe set by the rules, but UTA and Weitzman both refused, and the hearing date of the arbitration was repeatedly pushed back due to their scheduling conflicts, and Weitzman's acquiescence to UTA's requests for more time to conduct "discovery" and other investigation.

24. Weitzman's and UTA's disregard of the DGA-ATA's procedural rules continued and escalated. The DGA-ATA Agency Agreement arbitration

rules do not provide for any discovery. Thus, pursuant to both the California Code of Civil Procedure and the Federal Arbitration Act, neither side had any discovery rights from the other, although either side was free to pursue non-discovery investigation. Indeed, Sonnenfeld repeatedly referenced to both UTA and Weitzman that there could not possibly be discovery within the 15-day schedule required by the DGA-ATA Agency Agreement arbitration rules, that to extend the arbitration schedule to allow such discovery was improper, and necessarily increased the cost of the arbitration, thus causing substantial prejudice to Sonnenfeld on this ground alone.

25. At the same time that Sonnenfeld repeatedly referenced the prejudice being caused by the unauthorized deviation from the required schedule and the higher costs and fees that were necessarily being imposed as a result, Sonnenfeld was exceptionally candid with information. Sonnenfeld's representatives voluntarily provided UTA with confidential operative drafts of both the MIB II and MIB III agreements, produced Attorney Cook for an in-person interview with UTA's counsel, and provided UTA with extensive information to move along the arbitration process.

26. Even more, Sonnenfeld's representatives arranged for Columbia's business affairs executive who had been the point person for negotiations with Sonnenfeld on MIB III to voluntarily meet with UTA's representatives. Sonnenfeld is informed and believes, and on that basis alleges that, Columbia confirmed to UTA that Columbia had not honored any negotiation clause in any prior MIB agreement and instead had required Sonnenfeld to enter into an entirely new negotiation for MIB III, starting from scratch. Sonnenfeld is further informed and believes and thereon alleges that Columbia confirmed to UTA that Columbia declined to honor the clear material terms floor of the MIB II agreement. UTA nonetheless continued to press its claim for a 15-year tail, in express disregard of the collective bargaining agreement.

27. On July 26, 2011 – more than four months after the arbitration hearing should have taken place and the arbitration should have been entirely over – UTA made a motion for authorization to conduct discovery and/or issue a subpoena duces tecum to discover all non-privileged, non-work product contents of the negotiation files maintained by Attorney Cook regarding the negotiations of Sonnenfeld's contracts for MIB II and MIB III. UTA's filing of the motion was also in disregard of Weitzman's prior direction that the parties have further teleconferences with the arbitrator prior to the filing of any such motion.

28. On September 6, 2011, Sonnenfeld opposed UTA's discovery motion, raising yet again the violations of the scheduling rules and the non-discovery nature of the arbitration.

29. On September 9, 2011, in violation of the DGA-ATA Agency Agreement arbitration rules, the California Code of Civil Procedure and the Federal Arbitration Act, Weitzman granted discovery rights to UTA in the form of a subpoena duces tecum for production of documents by Sonnenfeld and Attorney Cook approximately sixty (60) days prior to the commencement of the arbitration hearing – and where the arbitration rules required the arbitration hearing to take place within fifteen (15) days of setting of the arbitration panel. Sonnenfeld objected that the ruling was prohibited, including that it violated the Federal Arbitration Act, and UTA agreed in writing that Sonnenfeld had preserved the issue for any challenge to the arbitration award.

30. In December and January 2012, Weitzman granted requests by UTA and Sonnenfeld to issues arbitration hearing subpoenas in blank for service on witnesses who each side might desire to appear and give testimony at the arbitration. Sonnenfeld and UTA both delivered subpoenas to Columbia's business affairs executive and he confirmed that he would in fact attend the arbitration. Sonnenfeld is informed and believes, and on that basis alleges that, Columbia's business affairs executive reaffirmed to UTA at this time that he

1 would testify that Columbia admittedly did not honor the clear material terms
2 floor of the MIB II agreement, and instead required Sonnenfeld to conduct a
3 completely new negotiation from scratch.

4     31. In January 2012, the parties and Weitzman agreed that the first day of
5 the arbitration hearing would be conducted as a mediation-arbitration. A
6 mediation-arbitration was thus held on January 17, 2012, with Weitzman
7 receiving statements from witnesses and counsel. On January 17, 2012,
8 Weitzman disclosed for the first time that he had had personal involvement with
9 the 1993 *Friedkin v. UTA* arbitration award as one of the attorneys for Friedkin.
10 Weitzman emphasized that he understood the 1993 Dern award very well by
11 virtue of his personal involvement.

12     32. At approximately noon on January 17, 2012, Weitzman informed the
13 parties that the matter was not going to settle through mediation and that the
14 matter would proceed as an arbitration.

15     33. Prior to the hearing, Sonnenfeld planned to introduce the testimony
16 of Columbia Pictures' executive who was involved in negotiations of the 2010
17 MIB III Agreement. The Columbia executive was on-call to appear at 1:00 p.m.
18 on January 17, 2012, pursuant to a subpoena. However, Arbitrator Weitzman
19 dissuaded Sonnenfeld from calling the Columbia executive, assuring Sonnenfeld
20 that Weitzman understood that the Columbia executive would testify that (1)
21 Columbia discounted the MIB I and MIB II contracts, (2) that Columbia decided
22 to approach and attempt to hire Sonnenfeld only after and as the result of
23 independent investigation had determined that Sonnenfeld was the best candidate,
24 (3) in the negotiations with Sonnenfeld, Columbia declined to honor the clear
25 material terms of the MIB II agreement and never made any offer to Sonnenfeld
26 even close to the contractually required floor, and (4) the MIB III deal was a
27 completely new deal negotiated between him and Attorney Cook. As a result of
28

Weitzman's assurances that no testimony was needed to prove these points, the Columbia executive was released and did not testify.

34. On January 17, 2012, Weitzman declared the arbitration hearing over and informed the parties that he desired closing briefs followed by oral closing arguments. Weitzman proceeded to set a briefing schedule for closing arbitration briefs and set the date for oral closing arguments for February 2, 2012.

35. There was no dispute in the arbitration that there was never any written agency agreement between Sonnenfeld and UTA. In both his opening and closing arbitration briefs and oral closing arguments, Sonnenfeld argued that Columbia Pictures ultimately did not honor the MIB negotiation clause for MIB III, because they failed to honor the contractually required negotiating floor, and that the negotiation for Sonnenfeld to render services on MIB III was a separate agreement, completely negotiated by Attorney Cook. Furthermore, the information and evidence presented in the arbitration made it crystal clear that the 2010 MIB III agreement was not entered into prior to the 1995 termination of UTA's agency fifteen years earlier – indeed, it would be preposterous even to propose otherwise, and even the illegal arbitration award makes no such finding. Sonnenfeld clearly and repeatedly raised and explained the express prohibition on post-termination commissions contained in the DGA-ATA collective bargaining agreement where there is no signed agency agreement and the requirement that, to be entitled to any commission, UTA thus had to prove that the 2010 MIB III Agreement was entered into in 1995, prior to the termination of UTA's agency – an impossibility.

36. On March 16, 2012, Arbitrator Weitzman found in favor of UTA and against Petitioner Sonnenfeld. Against both the information and evidence presented and the applicable legal and collective bargaining agreement standards – and directly contrary to the proffered testimony of the effectively excluded Columbia executive – Weitzman awarded a commission to UTA based on a

determination that UTA was responsible – indirectly- for procuring the MIB III employment, and because, according to Weitzman, Sonnenfeld obtained the employment because of a several-layers removed relationship to a negotiation clause in the MIB I agreement. This finding completely contradicts the collective bargaining agreement's express terms barring agency commissions on oral agency agreements unless the agent proves that the employment was entered into prior to the termination of the agency. Weitzman ordered Sonnenfeld to pay UTA a commission of 10% of all compensation paid or payable to him under the MIB III Agreement up to a ceiling of $325,000. Arbitrator Weitzman also awarded UTA the same commission on any amounts paid to Sonnenfeld on any subsequent sequels or remakes of MIB. The Decision and Award were sent by electronic mail to the attorney for Petitioner Sonnenfeld on March 19, 2012. This petition is timely filed since it is filed within three months of the date the Decision and Award was delivered to the parties.

## THE COURT MUST VACATE OR MODIFY THE AWARD

37.   The Arbitration Award should be vacated and/or modified under 9 U.S.C. Section 10 because the Arbitrator manifestly disregarded the law, and because his decision fails to draw its essence from the DGA-ATA Agency Agreement. Case law recognizes that an award may be vacated if the arbitrator acts in "manifest disregard of the law." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L.Ed.2d 985 (1995); *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641, fn. 5 (9th Cir. 2010). A manifest disregard of the law occurs where "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether"; and "the law ignored by the arbitrators was well-defined, explicit and clearly applicable to the case." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879-880 (9th Cir. 2007). Moreover, a labor arbitrator's award is subject to judicial review on the grounds that the award (1) does not "draw its essence" from the "CBA", (2) exceeds the

1  scope of the issues submitted to the arbitrator, (3) runs counter to public policy, or
2  (4) was procured by fraud. *United Steelworkers of Am. v. Enter. Wheel & Car
3  Co.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

4      38.    Arbitrator Weitzman failed to abide by the express terms of the
5  collective bargaining agreement, including by the terms of the collective
6  bargaining agreement set forth in the 1993 Dern award. Accordingly, the award
7  did not draw its essence from the collective bargaining agreement. *Trailways
8  Lines Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1419-1420 (8th
9  Cir.1986) (finding award did not draw its essence from the collective bargaining
10 agreement where subsequent arbitrator did not incorporate construction of term in
11 agreement by prior arbitrator).

12     39.    The Arbitration Award must be vacated because Weitzman exceeded
13 his power by failing to comply with the procedural requirements of the DGA
14 Arbitration Clause. *Western Employers Ins. Co. v. Jeffries & Co., Inc.*, 958 F.2d
15 258, 262 (9th Cir. 1992) ( "arbitrators can [] 'exceed their powers' under 9 U.S.C.
16 § 10(d) [now 9 U.S.C. § 10(a)(4)] when they fail to meet *their* obligations, as
17 specified in a given contract, to the parties"). Here, as in *Western*, Weitzman
18 failed to abide by the terms of the DGA-ATA Agency Agreement, thereby
19 mandating that the award he issued be vacated. The DGA-ATA Agency
20 Agreement specifically states, "Within FIVE days following the selection of the
21 third Arbitrator, the Arbitrators shall notify the Arbitration Secretary of a time,
22 which shall not be more than fifteen days thereafter, for a hearing." The parties
23 stipulated that Weitzman would serve as sole arbitrator in lieu of an arbitration
24 tribunal. On January 28, 2011, the DGA arbitration secretary notified Weitzman
25 that "the timeline to schedule the hearing is relatively short" and provided
26 Weitzman with a copy of the DGA-ATA Agency Agreement. *Id*. The arbitration
27 thus should have been set for hearing by mid-February 2011. Nonetheless,
28 Weitzman completely ignored this requirement in derogation of the parties' rights

1 under the DGA-ATA Agency Agreement. Furthermore, Weitzman allowed UTA
2 discovery rights to proceed and did not schedule the hearing to take place within
3 the allotted time. In fact, the arbitration hearing did not take place until February
4 2, 2012, *nearly a full year* after it should have been scheduled. This substantially
5 prejudiced Sonnenfeld, including by radically increasing the costs, fees and
6 burdens of the arbitration relative to what was bargained for in the collective
7 bargaining agreement, and also by making the arbitration hearing date perpetually
8 uncertain to Sonnenfeld and his representatives, making it exceedingly difficult to
9 plan and prepare for the arbitration and to prepare witnesses and evidence in any
10 kind of efficient manner.

## **PRAYER**

Based on the facts set forth above, Petitioner Sonnenfeld prays that this Court:

    A.    Vacate and/or modify the arbitration award;

    B.    Award Petitioner Sonnenfeld his costs, if any, in this proceeding; and

    C.    Award such other and further relief as the Court may deem just and proper.

Dated: April 24, 2012        CYPRESS, LLP

By: /s/ Nabil L. Abu-Assal
Nabil L. Abu-Assal
Attorneys for Petitioner Barry Sonnenfeld